UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WESAM ZUMUT, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
|       v. | )   No. 14 C 6479 |
| | ) |
| MICHAEL LEMKE, DR. SALEH OBAISI, | )   Judge Rebecca R. Pallmeyer |
| RICARDO TEJEDA, and SHANAL | ) |
| BARNETT, | ) |
| | ) |
|       Defendant(s). | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Wesam Zumut, an Illinois state prisoner, brings this action pursuant to 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution. Plaintiff fractured his toe during a basketball game at Stateville Correctional Center, and he alleges that certain prison officials and medical providers were deliberately indifferent to serious medical needs that arose from this incident. Plaintiff has sued Defendants Dr. Saleh Obaisi, Stateville's medical director; Nurse Shanal Barnett, a corrections medical technician who treated Plaintiff immediately following his injury; Michael Lemke, the warden of Stateville; and Ricardo Tejada, an assistant warden. Plaintiff also sued Doretta O'Brien, an assistant warden, and Sarah Mays, a correctional medical technician, but he has moved voluntarily to dismiss the claims against them.

Dr. Obaisi has moved for summary judgment [76], arguing that Plaintiff has not proven that he suffered from an objectively serious medical condition, that Dr. Obaisi was subjectively aware of any serious medical condition, or that Dr. Obaisi displayed deliberate indifference to Plaintiff's condition. The other Defendants (the Illinois Department of Corrections ("IDOC") Defendants) have also moved for summary judgment [81], arguing that Defendants Lemke and Tejada had no personal involvement in Plaintiff's medical treatment and that Plaintiff lacks any

evidence that Nurse Barnett acted with deliberate indifference to Plaintiff's medical needs. For the reasons stated below, the court grants Defendants' motions.

## **BACKGROUND**

Plaintiff injured his foot while playing basketball in prison on July 13, 2013. (IDOC Defs.' Local Rule 56.1 Stmt. of Uncontested Facts [82] (hereinafter "IDOC Defs.' 56.1") ¶ 11.) Nurse Barnett treated Plaintiff immediately following the injury and provided him with an ice pack, a pain reliever (Tylenol), and a crutch, but did not contact a physician or refer Plaintiff for x-rays. (*Id.* ¶¶ 12–9). Four days later, after Plaintiff complained to another nurse that he was still in pain, a physician's assistant examined Plaintiff and ordered an x-ray of his left foot. (Dr. Obaisi's 56.1 Stmt. of Undisputed Mat. Facts [77] (hereinafter "Obaisi 56.1") ¶ 39.) That same day, Dr. Obaisi examined Plaintiff for the first time. After reviewing the x-ray, Dr. Obaisi determined that Plaintiff's fifth metatarsal bone (the long bone on the outside of the foot that connects to the little toe) was fractured but in "good position." (*Id.*) A fractured bone is in "good position" if there is no displacement of the bone that would require reduction or fixation. (*Id.* ¶ 41.) Dr. Obaisi ordered a fiberglass cast to immobilize Plaintiff's foot; prescribed Motrin, an anti-inflammatory drug, and Norco, a narcotic painkiller; and issued permits for Plaintiff to use two crutches for six weeks and to use a low bunk and be housed on a lower floor of the prison for six months. (*Id.* ¶ 39.)

Plaintiff's foot eventually healed in proper alignment, and his pain subsided, though the healing process took longer than normal. Dr. Obaisi testified that he would have expected to see callus[1] formation at the site of the fracture around five weeks after the injury. (*Id.* ¶ 51.) But an x-ray taken on August 23, a little more than five weeks after the injury, showed no signs of callus. (*Id.* ¶ 50.) Subsequent x-rays, including one taken at least eleven weeks after the injury, still showed no signs of callus formation. (*Id.*) Dr. Obaisi ordered another x-ray after examining

---

[1] Callus is the accumulation of calcium and protein at the site of the fracture and is a sign that the bone is fusing together and healing. (Obaisi 56.1 ¶ 50.)

Plaintiff on October 31, a little more than three and a half months after the injury. (*Id.* ¶ 59.) Because callus formation was visible on that x-ray, Dr. Obaisi authorized Plaintiff to begin partial weight bearing and prescribed Vitamin D to help strengthen the bone. (*Id.* ¶ 60.) Plaintiff's cast was removed in late November 2013, and Plaintiff testified that by January 2014, six months after the injury, his pain level was at two to four on a scale from one to ten. (*Id.* ¶ 61.) In February 2014, Plaintiff began physical therapy to rebuild the muscle strength he had lost while his foot was immobilized in the cast. (*Id.* ¶ 62.)

Plaintiff complains that he received inadequate medical treatment from Nurse Barnett and Dr. Obaisi. According to Plaintiff, his fracture was not diagnosed and properly treated until four days after the injury, and he attributes this delay in proper treatment to Nurse Barnett's failure to consult a qualified medical professional, who could have ordered an x-ray of Plaintiff's leg on the day of his injury. (Pl.'s Local Rule 56.1 Stmt. of Facts [96] (hereinafter "Pl.'s 56.1") ¶¶ 8, 11.) Plaintiff maintains that the record supports an inference that Nurse Barnett knew that he had suffered a severe injury at the time she treated him, and that her failure to secure timely and appropriate treatment for him reflects deliberate indifference. As Plaintiff asserts in an affidavit, when Nurse Barnett examined Plaintiff immediately following his injury, his foot was swollen, and he told her that he was in significant pain and that he had heard an unusual popping noise in his foot at the time of the injury. (*Id.* ¶ 2.) By Plaintiff's account, Nurse Barnett responded to Plaintiff's complaints merely by providing him with a single crutch and telling him that he did not have a serious injury and should "stop crying and man up." (*Id.* ¶¶ 3, 7.)

Nurse Barnett disputes Plaintiff's version of events. According to her treatment notes, Nurse Barnett did observe swelling in Plaintiff's left ankle, but Plaintiff was able to move his toes and did not show any signs of bruising. (IDOC Defs.' 56.1 ¶¶ 13–14.) Barnett concluded that Plaintiff's symptoms were consistent with a "rolled" ankle. (*Id.* ¶ 19.) Based on that diagnosis, she gave Plaintiff an ice pack to relieve the swelling in his ankle and instructed him to keep his leg elevated. (*Id.* ¶ 16.) She also provided him with twelve 325-milligram tablets of Tylenol to

3

relieve his pain and told him to follow up with the prison's health care unit in one week if his symptoms worsened. (*Id.* ¶ 18.) Dr. Obaisi testified that Barnett's treatment of Plaintiff was "[a]bsolutely appropriate." (*Id.* ¶ 20; Dep. of Dr. Saleh Obaisi (hereinafter "Obaisi Dep."), Ex. H to IDOC Defs.' 56.1 [86], 41:5–7.)

With respect to Dr. Obaisi's treatment of Plaintiff, Plaintiff has two general complaints. First, although Dr. Obaisi prescribed Norco, a narcotic painkiller, for Plaintiff on the day he first examined him, Plaintiff faults Dr. Obaisi for the fact that Plaintiff did not actually receive a Norco dose until approximately ten days later. (Pl.'s 56.1 ¶¶ 19–21.) Plaintiff argues that by allowing Plaintiff to remain in pain for an extended period of time without ensuring that Plaintiff received the prescribed painkiller, Dr. Obaisi demonstrated deliberate indifference toward his serious medical needs. Second, Plaintiff faults Dr. Obaisi for failing to refer Plaintiff to an orthopedic specialist. Plaintiff notes that Dr. Christopher Yenter, a physician who examined Plaintiff at St. Joseph Medical Center, a nearby hospital, had recommended that Plaintiff follow up with an orthopedic specialist. (Pl.'s Resp. to Obaisi 56.1 [97] ¶ 70.) Another physician at the prison, Dr. Ann Davis, had sent Plaintiff for emergency treatment at St. Joseph on July 26, 2013, thirteen days following his injury, after examining Plaintiff and noting that he was in extreme pain and had other signs of vascular compromise, such as swollen, blue toes. (*Id.*) Upon examination of Plaintiff, Dr. Yenter determined there was "no clear evidence of . . . ischemia [or vascular compromise]" and discharged him "back to Stateville with follow up with orthopedics on Monday and further evaluation." (St. Joseph Medical Center Report of July 27, 2013, Ex. B to IDOC Defs.' 56.1 [83], 207.) Plaintiff maintains that Dr. Obaisi should have heeded Dr. Yenter's recommendation and referred Plaintiff to a specialist—that is, to "follow up with orthopedics"— especially after it became clear that Plaintiff's healing was delayed. Dr. Obaisi responds, and Plaintiff does not dispute, that physicians at Stateville follow traditional principles of continuity of care, under which Dr. Davis, and not Dr. Obaisi, was the doctor responsible for following up with Plaintiff's care after his discharge from the hospital because she was the treating physician who

4

had referred him for treatment at the hospital. (Obaisi 56.1 ¶ 17.) Dr. Obaisi also points out that Plaintiff's injury eventually fully healed, and he opined that Plaintiff did not need to see an orthopedic specialist. (*Id.* ¶ 48; Obaisi Dep. at 73:7–74:7.)

In addition to his complaints about the medical treatment he received, Plaintiff also alleges that the prison's warden and assistant warden demonstrated deliberate indifference to his serious medical condition. Plaintiff alleges that he attempted to notify Lemke and Tejada by letter to inform them that he was in pain and was receiving suboptimal medical treatment but that they ignored his letters. Indeed, according to Plaintiff, the way Lemke and Tejada operated the prison's grievance procedure ensured that they would never hear complaints like Plaintiff's, thereby demonstrating their deliberate indifference inmates who have medical conditions similar to his. In his letters, Plaintiff complained about the care he received from Nurse Barnett, noted that he had not received responses to previous emergency grievances, explained that he was in in pain and that his foot was swollen and discolored, and requested to see a podiatrist. (Letter from Plaintiff to Lemke of July 26, 2013, Ex. D to Pl.'s Third Am. Compl. [42-4], 1–3; Letter from Plaintiff to Tejada of July 26, 2013, Ex. D to Pl's Third Am. Compl. [42-4], 7–9.) Neither Lemke or Tejada remembers receiving a letter from Plaintiff, and there is no evidence in the record that they did receive the letters. (IDOC Defs.' 56.1 ¶ 49.) Lemke has designated members of his staff to review inmate grievances. (Pl.'s 56.1 ¶ 28.) Kevin Senor, one of Lemke's designees, reviewed Plaintiff's July 26, 2013 letter, and after investigating, determined that Plaintiff "was being seen by the healthcare unit and that he had been provided with services that he was requesting to be seen about, his foot, and the healthcare unit had advised us that they had taken appropriate action." (IDOC Defs.' Resp. to Pl.'s 56.1 [106] ¶ 30; Dep. of Kevin Senor, Ex. I to IDOC Defs.' 56.1 [82-5], 38:4–8.) Senor concluded that the grievance was not an emergency and sent the letter to a grievance officer, who recommended that no action be taken because Plaintiff appeared to be receiving appropriate medical care. (Pl.'s 56.1 ¶ 31.) As for Tejada, he is unsure whether he or his clerk, who screens Tejada's letters, ever received

Plaintiff's letter. (*Id.* ¶ 34.) Tejada testified that if a letter like Plaintiff's did come to his attention, he would contact the healthcare unit to try to resolve the grievance (*id.*), but he also points out, and Plaintiff does not dispute, that Tejada is not responsible for overseeing inmate medical care or for responding to inmate grievances. (IDOC Defs.' 56.1 ¶ 53.) Rather, he oversees maintenance, dietary, mail room, fire and safety, and the Weapons Task Force matters at Statesville. (*Id.* ¶ 52.)

Plaintiff filed this suit *pro se* in August 2014, and the court recruited counsel to represent him. Defendants have moved for summary judgment, arguing among other things that Plaintiff has failed to produce evidence from which a jury could conclude that any Defendant was deliberately indifferent toward Plaintiff's serious medical needs.

## **DISCUSSION**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a reasonable jury could find for Plaintiff, the court views the evidence in the light most favorable to him, but "he nevertheless must present specific facts showing that there is a genuine issue for trial." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 630 (7th Cir. 2017). An inference that relies on "speculation or conjecture" is insufficient. *Id.* at 630–31.

"A prison official may be found in violation of an inmate's Eighth Amendment right to be free from cruel and unusual punishment if she acts (or fails to act) with deliberate indifference to his serious medical needs." *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015). To prove a claim for deliberate indifference, a prisoner must satisfy an objective element and an objective element: the prisoner must show that his medical needs or the conditions of his imprisonment "were objectively serious enough to amount to a constitutional deprivation and that defendants

6

possessed a sufficiently culpable state of mind." *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015). The subjective element of deliberate indifference "entails something more than mere negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Indeed, "it approaches intentional wrongdoing." *Burton*, 805 F.3d at 784. To be found deliberately indifferent, the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

**I.   Nurse Barnett**

Plaintiff contends that Nurse Barnett displayed deliberate indifference toward his serious medical needs by refusing to consult with qualified medical professionals about Plaintiff's injury, thereby causing a delay in his treatment. The IDOC Defendants respond that Nurse Barnett was far from indifferent toward Plaintiff's injury and that, on the contrary, she provided him adequate medical care based on her observations of his injury. The court agrees with the IDOC Defendants. Nurse Barnett determined that Plaintiff's symptoms—namely, his swollen ankle, lack of bruising, and ability to move his toes—were consistent with a rolled ankle, and she provided him with ice, a pain reliever, and a crutch. She also told him to keep his leg elevated and to follow up for treatment if his condition worsened in a week. It is true that "receipt of *some* medical care does not automatically defeat a claim of deliberate indifference." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (emphasis in original). But to sustain a claim of deliberate indifference, the evidence must allow a fact finder to "infer the treatment was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate a condition." *Id.* (internal quotations marks omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Even when viewed in the light most favorable to Plaintiff, the evidence does not support an inference that Nurse Barnett actually suspected that Plaintiff had a fractured foot but intentionally refused to arrange for an x-ray anyway or that her treatment

7

was so blatantly inappropriate that it evidenced intentional mistreatment. *Cf. Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015) (evidence supported inference that doctor suspected inmate's hand was fractured where inmate had severe swelling two days after injury, loss of function and mobility in all fingers, and discoloration, and where nurse telephoned doctor after working hours on Christmas Eve and described the injury as a "possible/probably injury"). Indeed, Dr. Obaisi, the only physician in this case to opine on the treatment Nurse Barnett provided, testified that her treatment was "absolutely appropriate." (Obaisi Dep. 41:5–7.)

In addition to Nurse Barnett's failure to consult another medical professional to obtain an x-ray, Plaintiff points to the facts that Nurse Barnett gave him only one crutch and told him to "stop crying and man up." But these facts are inadequate to establish an Eighth Amendment violation. Nurse Barnett testified that she believed Plaintiff only needed one crutch because only one leg was injured, "so he was able to ambulate with one crutch." (Dep. of Shanal Barnett, Ex. F to IDOC Defs.' 56.1 [84], 31:3 – 8.) Plaintiff has not produced evidence that Nurse Barnett's treatment decision in that instance was so inappropriate that "no minimally competent professional would have so responded under those circumstances." *Pyles*, 771 F.3d at 409. With respect to Nurse Barnett's comment that Plaintiff's injury was not serious and that he should stop crying and "man up," the comment may have been inappropriate, but it may also simply have reflected that she did not actually believe Plaintiff had suffered an injury more serious than a rolled ankle. In any event, rudeness and poor bedside manner do not amount to a constitutional injury. *See Seidel v. Sheriff*, No. 13 C 6164, 2016 WL 1043406, at *3 (N.D. Ill. Mar. 16, 2016) (doctor who was dismissive of and rude about injury not deliberately indifferent because rudeness "alone is insufficient to sustain a claim for deliberate indifference"); *Brown v. Darnold*, No. CIV.A. 09-240-GPM, 2011 WL 4336724, at *4 (S.D. Ill. Sept. 14, 2011) ("While Plaintiff's allegations that Defendant Darnold yelled at him and Defendant Clevy laughed at his pain are disconcerting, such conduct—while rude and insensitive—does not rise to the level of deliberate indifference.").

8

**III.     Dr. Obaisi**

Plaintiff contends that two aspects of Dr. Obaisi's treatment support a claim for deliberate indifference: his failure to ensure that Plaintiff received the pain medication that Dr. Obaisi prescribed and his failure to refer Plaintiff to an orthopedic specialist for treatment. Neither purported failure, however, constitutes deliberate indifference. There is no evidence that Dr. Obaisi was aware that the narcotic painkiller he prescribed for Plaintiff had not been administered. Plaintiff argues that "[h]ad [Dr. Obaisi] looked at [Stateville's] Medication Administration Record anytime between July 17 when he issued the prescription and 10 days later when the drug was first administered he would have seen that Plaintiff had been deprived of this important pain-relief medication." (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. [99] (hereinafter "Pl.'s Mem."), 7.) Plaintiff does not, however, provide any argument or evidence to support the conclusion that Dr. Obaisi had an obligation to ensure that the drugs he prescribes are actually administered. The notion that deliberate indifference is established by a a physician's failure to investigate whether a patient received a drug is inconsistent with the Seventh Circuit's ruling in *Arnett v. Webster*, 658 F.3d 742 (7th Cir. 2011). In *Webster*, it appeared that an inmate's treating physician believed he had submitted a request for a prescription drug, and failed to investigate further to see whether the inmate had received the medication even after the inmate informed the physician months later that he had not received the medication. *Id.* at 758. The Seventh Circuit agreed with the inmate that, given his "condition and repeated pleas for [the drug, the doctor] should have investigated further." *Id.* Yet the court concluded that even though the failure to investigate "may amount to negligence," it did not amount to deliberate indifference because there was not enough evidence that the physician "failed to act despite knowledge of a substantial risk of serious harm to [the inmate]." *Id.* Similarly, in this case, Plaintiff has not produced evidence that Dr. Obaisi knew Plaintiff had not received the prescribed painkiller. The delay in receiving the painkiller cannot be the basis for a deliberate indifference claim.

9

Nor is there sufficient evidence from which a jury could conclude that Dr. Obaisi's failure to refer Plaintiff to a specialist constitutes deliberate indifference. True, "[a] jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist." *Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016). But "[t]he validity of the inference rests primarily on the contemporaneity of the communication and the defendant's decision." *Id.* In this case, it is undisputed that Dr. Yenter treated Plaintiff and made a recommendation for "follow up with orthopedics" on July 27, 2013, at a time when Plaintiff was being treated by Dr. Davis. It is also undisputed that the first time Dr. Obaisi examined Plaintiff following Dr. Yenter's recommendation was on September 9, nearly a month and a half after Dr. Yenter made the recommendation, and that Plaintiff did not complain of foot problems during that examination. (Pl.'s Resp. to Obaisi 56.1 ¶ 53.) Dr. Obaisi also explained that he did not refer Plaintiff to an orthopedic specialist because he did not believe Plaintiff needed to see one. (Obaisi Dep. 73:7–74:7.) These circumstances do not support an inference that in deciding against referring Plaintiff to a specialist, Dr. Obaisi consciously disregarded a serious risk. In addition, Plaintiff cannot prove a claim for deliberate indifference without "providing evidence that the [doctor's alleged] failure caused injury." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013); *see also id.* (noting requirement that plaintiff offer "verifying medical evidence" of causation). It is undisputed that Plaintiff's injury did heal in this case, and Plaintiff has not produced any evidence suggesting referral to an orthopedic specialist would have resulted in quicker or better healing. *Cf. Alvarez v. Wexford Health Sources, Inc.*, No. 13 C 703, 2016 WL 7046617, at *6 (N.D. Ill. Dec. 5, 2016) (question of fact whether Dr. Obaisi's failure to follow specialist's recommendation of physical therapy caused harm where the physical therapy the plaintiff did receive appeared to have resolved his issues).

### III.     Lemke and Tejada

Plaintiff maintains that if Lemke and Tejada had read the letters he sent them, they would have been alerted to his serious medical needs, and he argues that they showed

deliberate indifference by failing to read or respond in any way to the letters. The IDOC Defendants respond that Plaintiff has failed to establish that they were actually "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *Farmer*, 511 U.S. at 837, because neither Lemke nor Tejada actually read Plaintiff's letters or was aware of the conditions about which he complained.

Plaintiff argues that the court "should not allow Lemke to escape liability because he used an administrative system which made it impossible for an inmate [to] supply the warden with the information necessary [to alert him to a serious medical need]." (Pl.'s Mem. at 11.) The court shares the concern Plaintiff raises. In a case before another court in this district, Judge Gottschall expressed skepticism about a warden's ability to "use the fact that he delegated much of the review of medical grievances to administrative assistants to insulate himself from liability for problems of which the grievances would have put him on notice." *Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 992 (N.D. Ill. 2012). There is, however, a significant difference between this case and *Flournoy*. In *Flournoy*, the court concluded that the evidence supported a finding that the warden "was alerted to a systematic failure of the medical staff to promptly provide prescriptions." *Id.* at 991. By contrast, there is no evidence in this case that Plaintiff's alleged injury was the result of a systematic failure of the medical staff. As the *Flournoy* court itself noted, prison wardens are "not responsible for individual incidents that occur in the day-to-day operation of a prison, but only for systematic lapses in policies meant to protect prisoners." *Id.* (citing *Steidl v. Gramley*, 151 F.3d 739, 741–42 (7th Cir. 1998)). As a result, without evidence that Lemke was actually aware of Plaintiff's condition or of any systematic lapse in policies in this case, he was entitled to rely upon the expertise of his medical personnel, and his mere "inaction following receipt of a complaint about someone else's conduct is not a source of liability." *Estate of Miller by Chassie v. Marberry*, 847 F.3d 425, 429 (7th Cir. 2017). Regarding Tejada, Plaintiff has admitted that the assistant warden is not even responsible for overseeing inmate medical care or responding to inmate grievances. Plaintiff nevertheless maintains that

he can proceed with a claim against Tejada because Tejada would have investigated Plaintiff's complaints if he had received Plaintiff's letter. But the Seventh Circuit has rejected the notion that "everyone who knows [or could have known] about a prisoner's [medical] problem must pay damages." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). The assistant warden, like the warden, "is entitled to relegate to the prison's medical staff the provision of good medical care." *Id.*

## **CONCLUSION**

For the reasons stated above, the court grants Defendants' motions for summary judgment [76] [81].

ENTER:

Date: September 11, 2017

_____
REBECCA R. PALLMEYER
United States District Judge